IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALIA SALEM AL-SABAH,

   *Plaintiff*,

     v.

JEAN AGBODJOGBE, *et al.*,

   *Defendants.*

Civil Action No. ELH-17-730

**MEMORANDUM OPINION**

Plaintiff Alia Salem Al-Sabah, a citizen of Kuwait, filed suit in March 2017 against multiple defendants, including Jean Agbodjogbe; Nandi Scott; N&A Kitchen, LLC ("N&A Kitchen"); N&A Kitchen II, LLC; 5722 York Road, LLC; 9 Jewels, LLC; and ASA Foundation, Inc. ECF 1. She alleged, *inter alia*, that Agbodjogbe "orchestrated" a "scheme" by which he "misappropriate[d] millions of dollars entrusted to him" by plaintiff for "investment opportunities" and for charity. *Id.* ¶ 1. Subject matter jurisdiction is founded on diversity of citizenship, pursuant to 28 U.S.C. § 1332.

In a nine-count Amended Complaint filed in November 2017 (ECF 76), plaintiff alleges claims of fraudulent misrepresentation (Count I); fraudulent concealment (Count II); conversion (Count III); civil conspiracy (Count IV); detrimental reliance (Count V); unjust enrichment (Count VI); breach of contract (Count VII); and breach of agency duties (Count VIII). She also seeks a declaratory judgment (Count IX) (*see id.* ¶¶ 46-93). Plaintiff seeks actual damages, punitive damages, and other equitable relief. *Id.* at 20-22.[1]

---

[1] N&A Kitchen II, LLC is not identified as a defendant in the opening paragraph of the Amended Complaint. But, it is named in the "Parties" section of the Amended Complaint. *See* ECF 76 at 2, ¶ 6. Moreover, it was named in the original suit.

After the parties had completed most discovery, plaintiff moved for partial summary judgment (ECF 115) against Agbodjogbe under Fed. R. Civ. P. 56, with respect to Count I (fraudulent misrepresentation) and Count VII (breach of contract). The motion for summary judgment is supported by a memorandum of law (ECF 115-1) (collectively, "Motion") and several exhibits. ECF 115-2 to ECF 115-9. Defendants have filed an opposition to the Motion (ECF 116, "Opposition"), accompanied by multiple exhibits. *See* ECF 116-1 to ECF 116-4.[2] Plaintiff replied (ECF 120, "Reply") and submitted additional exhibits. ECF 120-1 to ECF 120-5.[3]

No hearing is necessary to resolve the motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion as to Count VII (breach of contract) but deny it as Count I (fraudulent misrepresentation).

## I. Factual Summary

Al-Sabah first met Agbodjogbe in 2014 while she was visiting her daughter in Baltimore and went to his restaurant, Nailah's Kitchen. ECF 76, ¶ 14. While there, she purchased $8,000 of Halal food to donate to members of a local Mosque whose kitchen was destroyed in a fire. *Id.*

Agbodjogbe subsequently asked plaintiff to invest in his "fledging restaurant business," and she did. *Id.* ¶ 16. He also purported to help her with the creation of investment entities and

---

[2] Defendant filed the Opposition under seal (ECF 117), but I shall refer to the redacted filing, docketed at ECF 116.

[3] On December 28, 2018, defendants' counsel filed a motion to withdraw. ECF 132. That same day, the Court granted the motion, provided, however, that by January 9, 2019, any defendant may move to rescind this Order as improvidently granted. ECF 134. On January 7, 2019, Agbodjogbe so moved (ECF 136), requesting that the Court rescind the Order and "not allow [his] counsel to withdraw from this case." *Id.* at 1. The Court ordered defense counsel to respond by January 22, 2019. ECF 137.

However, the Motion is fully briefed. My ruling is not affected by the status of defense counsel.

charitable endeavors. *See, e.g.*, *id.* ¶¶ 18, 23-26. Al-Sabah asserts that between October 2014 and January 2015, she transferred more than $3 million to Agbodjogbe for investment. *Id.* ¶ 26. However, according to Al-Sabah, he used most of these funds for his own financial gain. *Id.* ¶¶ 28-40.

For example, Agbodjogbe formed a new entity, N&A Kitchen, for his restaurant partnership with Al-Sabah. *Id.* ¶ 18. He allegedly represented to plaintiff that she was a member and 50% owner of N&A Kitchen. *Id.* ¶ 19. However, the Complaint alleges that Agbodjogbe is the sole member of N&A Kitchen and may be its sole owner as well. *Id.* ¶ 29. Consequently, Al-Sabah asserts that when Agbodjogbe used her funds to purchase buildings through N&A Kitchen, "he effectively appropriated them for his own gain by putting them out of Ms. Al-Sabah's reach." *Id.* ¶ 29.

Denying these allegations, Agbodjogbe asserts that plaintiff "seeks to re-write history by claiming that the money she gifted to [him] was actually intended to be invested on her behalf, rather than given to [him] for his own investments." ECF 116 at 1-2. For example, in early 2015, Agbodjogbe purchased a residential property located at 103 Mt. Wilson Lane, Baltimore, Maryland, for $470,000 in cash, using a portion of an $825,000 wire he received from Al-Sabah. ECF 115-1 at 2. Agbodjogbe claims that plaintiff authorized him "to use some of these funds to purchase a home for his family." ECF 115-2 at 3. But, Al-Sabah maintains that she "had no knowledge of when the house was purchased, or that the purchase was funded with her money, and specifically denies that she ever authorized Agbodjogbe to buy himself a half-million-dollar home using her money." *Id.* at 2-3.

In deposition, Al-Sabah testified that she became suspicious of Agbodjogbe in April 2016, ECF 116-1 at 3, p. 185, and stopped transferring money to him. ECF 76, ¶ 41; ECF 116-1 at 3,

p. 185 ("I told him no more investments, finish."). She "demanded documentation relating to the entities purportedly formed and the transactions purportedly entered into by Mr. Agbodjogbe on her behalf." ECF 76, ¶ 41; *see also* ECF 116-1 at 3, p. 185 ("I want to see papers"). According to Al-Sabah, her requests for documentation "were met with further delays and misrepresentations," and eventually Agbodjogbe "became completely unresponsive to [her] attempts to communicate with him." *Id.*

On July 13, 2016, defendant Nandi Scott, who is married to Agbodjogbe, e-mailed Al-Sabah. *See* ECF 115-5 at 2. Scott claimed that Agbodjogbe "took out a loan against [their] home last year" and "has now defaulted on the loan." *Id.* She requested $350,000, explaining that if the loan is "not paid by Friday our home will go into foreclosure and we will be evicted." *Id.* She asked Al-Sabah to call her, *id.*, but Al-Sabah "never responded to the e-mail." ECF 115-6 at 3.

The same day that Al-Sabah received Scott's email, she "telephoned Agbodjogbe seeking additional information regarding the alleged foreclosure/eviction scenario." ECF 115-1 at 5. That night Agbodjogbe left her a WhatsApp voice message, explaining that the bank would evict him and his family from their home if they failed to make their upcoming loan payment.[4] He stated, ECF 115-7 at 5 (Transcription of voice message, prepared by plaintiff's counsel):

> Salaam Alaikum, sister. It's 11:00 o'clock here. I'm a little bit tired. On my way home. Mashallah, Nandi's father bring us another $100,000. So, that's $200,000 he give us. And, my friend give me also today a check for [$]85,000. So, we [are] only short $165,000. And, like I told Nandi, whatever Allah decide, I will accept it. This is not the end of the world. Mashallah, if you can help us for the sake of the children, Alhamdulillah, you know we'll really appreciate it. And whatever we have to do, we'll pay it back. But, you know, I was telling you this morning, ah, Allah already made a decision if the house going to be sold, it's going to be sold. If the house won't be sold, then Allah say we'll keep it-we'll keep it. So, you know, I understand her as a woman, but I want her belief to be stronger to know that everything was planned by Allah. You know, and this is the end result, Alhamdulillah. . . . So,

---

[4] WhatsApp is a smartphone application that enables users to send text messages and to make phone calls. *See* https://www.whatsapp.com/about.

Inshallah you know we have up until Friday morning at 10:00 o'clock, that's when the eviction, and the lawyer for the bank say if we bring the cashier's check by 8:30 - 9:00 o'clock, he'll stop the eviction and we'll pay the lawyer fee which is like $4,000 that I have. And, you know, we only short $165,000. So, Mashallah, if you can do it for the sake of the children, Alhamdulillah. I really appreciate you. And, uh, I was very upset, you know, with her for her, you know, calling you and sending you e-mails because she don't have no place doing that. I'm the man of the house. I should find a way to do, eh, fix it. You know, Alhamdulillah. You know, I'll wait for your call or your response, Inshallah. And, if it's possible before Friday 8:30 - 9:00 o'clock, Alhamdulillah. Salaam Alaikum.

"Despite [plaintiff's]" misgivings, in July 2016, "through one of her charities," Al-Sabah provided Scott and Agbodjogbe "an interest free loan in the amount of $150,000.00, secured by a check of $150,000.00 drawn on the N&A Kitchen deposit account." ECF 76, ¶ 43; *see* ECF 115-4 (Agbodjogbe deposition) at 13 (stating that the loan was made in 2016); ECF 116-1 (Al-Sabah deposition) at 3, p. 185 (stating the loan was made in July 2016). Notably, Agbodjogbe has said, ECF 115-4 at 15: "I believe it was a one year free interest loan"); *see also* ECF 115-9 (N&A Kitchen's bank statement reflecting receipt of $150,000 from Al-Sabah).

Agbodjogbe is allegedly the sole member of N&A Kitchen. ECF 76, ¶ 6. He acknowledges that the $150,000 represented a loan and not a gift. At his deposition, Agbodjogbe said: "The money was lended [sic] to me. It was not gifted to me. It was lended to me." ECF 115-4 at 14. Moreover, he admits that he has not yet repaid the loan. *Id.* (acknowledging three times that he still owed the money). Notably, at his deposition, Agbodjogbe was asked: "[S]o you still owe the money?" *Id.* at 15. He responded: "Totally correct and it would be paid if -- if things get better." *Id.*

The following exchange is also pertinent, *id.*:

[Plaintiff's Counsel]:   Well, you owe the money regardless, right?

[Agbodjogbe]:   Correct.

[Plaintiff's Counsel]:   You borrowed the money: you owe the money.

[Agbodjogbe]: No doubt about it.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 Fed. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

In sum, to avoid summary judgment, there must be a genuine dispute as to material

fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

### III. Discussion

Al-Sabah argues that, because Agbodjogbe has failed to repay her the $150,000 that she lent him in July 2016, he is in breach of contract. Further, she contends that she made this loan as a result of Agbodjogbe's fraudulent misrepresentation that he faced eviction because he was unable to make his mortgage payment.

### A. Breach of Contract[5]

#### 1. Principles of Contract Construction

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)); *see also Joseph*

---

[5] The parties assume that Maryland law applies with regard to contract principles. Therefore, I will apply Maryland law. As to contract claims, Maryland applies the law of the State in which the contract was formed ("lex loci contractus"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g., Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995). And, tort claims are ordinarily governed in Maryland by the law of the State in which the alleged harm occurred ("lex loci delicto"). *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).

*Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, ___ F.3d ___, No. 17-2090, slip op. at 5 (4th Cir. Jan. 14, 2019) (recognizing as a "bedrock principle of law" that a contract must be accepted by the offeree. Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *see RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the

plaintiff and a breach of that obligation by defendant.'" (Citation omitted); *see also Robinson v. GEO Licensing Co.*, L.L.C., 173 F. Supp. 2d 419, 423 (D. Md. 2001).

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). This includes the determination of whether a contract is ambiguous. *Sy-Lene of Wash., Inc. v. Starwood Urban*

*Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003). In such cases, "'[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted).

### 2. Analysis

Agbodjogbe maintains that "there is a genuine dispute of fact as to the identity of the parties to the contract[.]" ECF 116 at 12. He points to Al-Sabah's Amended Complaint, alleging that she provided him with an interest-free loan "'through one of her charities.'" ECF 116 at 5 (quoting ECF 76, ¶ 43). Further, when deposed by defense counsel on December 14, 2017, she testified that "'it's not [her] money.'" ECF 116 at 5 (alteration in original) (quoting ECF 116 at 3, p. 186).

But, the parties agree that the funds were provided "through one of [Al-Sabah's] charities."[6] ECF 116 at 3, p. 185; ECF 76, ¶ 43. When plaintiff's testimony is placed in context, it becomes clear that Agbodjogbe asked plaintiff for the money, and she directed Bader Alajmi, who manages her family's charity, to loan $150,000 to Agbodjogbe on her behalf. She then reimbursed the charity for the cost of the loan.

The following deposition testimony of plaintiff is relevant, ECF 116-1 at 2, p. 185-87 (emphasis added):

| | |
|---|---|
| [Defendants' Counsel] | Did you provide the loan through charities, through a charity? |
| [Plaintiff's Counsel] | Objection to form and foundation. You may answer. |
| [Al-Sabah] | I'm under oath, right? |
| [Defendant's Counsel] | You are. |

---

[6] The legal form of this Kuwati charity is unclear. Based on plaintiff's testimony, the charity does not appear to be a legal entity registered with the Kuwaiti government. *See* ECF 116-1 at 3-5, p. 185-94. Instead, it seems to be functionally akin to a family foundation, funded by plaintiff and other members of her family. The exact nature and structure of the charity is not material.

-11-

| | |
|---|---|
| [Al-Sabah] | It's a play, I did it because I don't want him to take it from me. So I want him to know it's a loan and from a third party which is better. |
| [Defendant's Counsel] | But it's really your money? |
| [Al-Sabah] | It's not my money. It's not even my account. I mean better give it to him, you deal with him because this is a loan. I don't want to deal with him. *But I have to cover the 150.* |
| [Defendant's Counsel] | Did it come from a charity? |
| [Al-Sabah] | No, it's not a charity. It is money – what do you call charity? Yeah, charity, the one you give the poor? That he goes and make pay for hospitals, sick people. Yeah, charity. |
| [Defendant's Counsel] | So it was money that came out of a charity that you used to then loan to or you gave to Bader to loan then to Jean [Agbodjogbe]? |
| [Al-Sabah] | Yeah, but you know what I did. He did that one and *I have to cover the 150* because it's not right. |
| [Defendant's Counsel] | Why is it not right? |
| [Al-Sabah] | Because not charity. He is not a poor man to get loan. You want it as an Islamic way, *it is not right to give him from this money and I have to go and cover it.* |

In essence, Alajmi, acting as Al-Sabah's agent, made a loan to Agbodjogbe, on behalf of Al-Sabah, using family money. ECF 116-1 at 2, p. 187. This does not undermine plaintiff's breach of contract claim, as an agent may contract on behalf of the principal.

According to the Restatement (Second) of Agency, "[t]he other party to a contract made by an agent for a disclosed or partially disclosed principal, acting within his authority, apparent authority or other agency power, is liable to the principal as if he had contracted directly with the principal, unless the principal is excluded as a party by the form or terms of the contract." *Id.* § 292 (1958); *see also* Restatement (Second) of Contracts § 52 (citing Restatement, Second, Agency § 292) ("The rules stated in the Restatement of this Subject are supplemented by the law of agency,

and in the absence of contrary statement it is assumed that any necessary act may be performed on behalf of a contracting party by his agent.").

Indeed, when Agbodjogbe accepted the loan, he understood that Alajmi was acting on Al-Sabah's behalf as her agent. At his deposition, Agbodjogbe testified, ECF 115-4 at 14:

> [Alajmi] told me it was a loan, one year free loan interest, but I know that for sure that from my understanding talking to [Alajmi] those couple days the money was not coming from [Alajmi] 100 percent. Alia just didn't want—that's what I'm assuming. That's my own word. The money was not coming from [Alajmi]. The money was coming from Alia but she just didn't want to give me no money. So [Alajmi] was the one who made the loan. And I write a check and took the check and take it to someone who was living in apartment on Liberty Street.

Moreover, "[a]s alluded to in [Agbodjobe's] testimony, and consistent with his understanding that Ms. Al-Sabah was the source of the funds being loaned to him, Agbodjogbe wrote a $150,000 check to Ms. Al-Sabah drawn on a checking account belonging to Defendant N&A Kitchen, LLC with a memo of 'loan collateral' as collateral for the loan." ECF 120 at 4 (citing ECF 120-1 at 2) ($150,000 check from N&A Kitchen to Al-Sabah for "loan collateral."). Additionally, Alajmi disclaimed any personal interest in the loan. ECF 120-2, ¶ 4 ("Alajmi Affidavit"). He also stated that "Al-Sabah ultimately funded the $150,000 to Mr. Agbodjogbe" and that "[n]o other family member, or anyone else, has a claim to repayment of the $150,000 loaned to Mr. Agbodjogbe in July 2016." *Id.*

Agbodjogbe also claims that because the parties dispute the identity of the lender, it is unclear if Agbodjogbe and Al-Sabah entered an enforceable contract. ECF 116 at 12-13. However, in light of the unambiguous evidence that Al-Sabah lent Agbodjogbe the funds, interest-free, for one year, there is no genuine dispute and this argument is of no moment.

Agbodjogbe agreed to accept a one-year interest free loan of $150,000 from Al-Sabah. Over a year later, Agbodjogbe has not repaid the loan. Therefore, I conclude that defendant is in breach of contract.

### B. Fraudulent Misrepresentation

Al-Sabah argues that she loaned Agbodjogbe $150,000 as a result of his fraudulent misrepresentation. Specifically, Al-Sabah alleges that she suffered financial harm because of her reliance on Agbodjogbe's fraudulent claim that he and his family faced eviction unless they could promptly produce $150,000.

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Regardless of the particular theory, at trial the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In an action for intentional or fraudulent misrepresentation, which is the garden variety of fraud and is often described simply as "fraud," the plaintiff ordinarily must show:

> 1) that the defendant made a false representation to the plaintiff;
> 2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
> 3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
> 4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
> 5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n. 18, 48 A.3d 276, 282 n. 18 (2012); *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (2008); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex*, *Inc.*,

332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). The "misrepresentation must be made with the deliberate intent to deceive," *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)), and the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

To establish reliance, "the misrepresentation need not have been the only motivation for the plaintiff's actions; it is sufficient that the misrepresentation substantially induced the plaintiff to act." *Nails*, 334 Md. 416-17, 639 A.2d at 669; *see also Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 533 (D. Md. 2011). Indeed, "'[i]t is not even necessary that [the plaintiff] would not have acted or refrained from acting as he did unless he had relied on the misrepresentation[.]'" *Id.* at 417, 639 A.2d at 669 (quoting Restatement (Second) of Torts § 546 (1977)).

Additionally, "a cause of action for fraud" has "a strict requirement of scienter." *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 147, 838 A.2d 404, 433 (2003). "Recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive." *Id.* at 147, 838 A.2d at 433.

**1.**

Al-Sabah maintains that Agbodjogbe "falsely represented to Plaintiff on July 13, 2016, that he needed several hundred thousand dollars to stave off eviction."[7] ECF 115-1 at 7. Further, Al-Sabah contends that there was "no bank, no mortgage secured by the property Agbodjogbe had purchased with Ms. Al-Sabah's cash (without her knowledge), no past-due mortgage amounts, no foreclosure proceedings underway, and no eviction on the horizon, imminent or otherwise." *Id.* at 2.

However, Agbodjogbe asserts that he had "taken out a loan on behalf of N&A Kitchen, LLC" and "personally guaranteed the loan." ECF 116 at 10; *see also* ECF 116-2 ("N&A Kitchen's loan"); ECF 116-3 ("Agbodjogbe Affidavit"), ¶¶ 2, 4. He owed a weekly loan payment of $9,749.78 on July 15, 2016, just two days after Agbodjogbe left the voicemail for Al-Sabah. ECF 116 at 10; *see also* ECF 116-3, ¶¶ 3, 5. Agbodjogbe "did not have the funds to ensure payment in full" and mistakenly believed that if he "missed the payment and did not cure the default, he would be forced to sell the his house." ECF 116 at 10; *see also* ECF 116-3, ¶¶ 5-6. After receiving the $150,000 loan from Al-Sabah, Agbodjogbe used a portion of the $150,000 loan from Al-Sabah to make the weekly payment that was due on his bank loan. ECF 116-3, ¶ 9.

But, even if Agbodjogbe believed he would be forced to sell his home if he failed to make the weekly payment, he still falsely stated that he was "only short $165,000." Moreover, as Agbodjogbe concedes in his affidavit, he only owed a weekly payment of $9,749.78.

---

[7] In the Motion, Al-Sabah also cited false statements in Scott's email to her on July 13, 2016. ECF 115-1 at 4-5. However, Agbodjogbe claimed that Scott wrote this email and he therefore did not make a false representation in it. ECF 116 at 7-8. Therefore, for the purposes of the Motion, Al-Sabah relies solely on Agbodjogbe's WhatsApp message. ECF 120 at 5 n.2.

ECF 116 3, ¶ 3. Yet, he told Al-Sabah that he had raised $200,000 from his father-in-law and $85,000 from a friend and now was "only short $165,000." ECF 115-7 at 5.

Agbodjogbe does not deny making this statement. Nor has he explained why he requested $165,000 from plaintiff when he owed less than $10,000. Indeed, if his representation to Al-Sabah was true, after Al-Sabah's $150,000 loan, Agbodjogbe would still have been $15,000 short. Yet, he admitted that he used only "a portion of the funds provided to make the July 15, 2016 payment" on the bank loan. ECF 116-3, ¶ 9. Accordingly, I find no genuine dispute as to whether Agbodjogbe falsely stated that he was "only short $165,000."

**2.**

Al-Sabah maintains that Agbodjogbe's scienter is "self-evident." ECF 120 at 9. Defendant has not explained why he asked plaintiff for a loan of $165,000 when the loan payment that was due was only $9,749.78. Nor has he explained why he thought, perhaps mistakenly, that he needed so much money. Further, he does not explain why he thought eviction was imminent. But, according to Agbodjogbe, Al-Sabah has not established that he had a "'deliberate intent to deceive.'" ECF 116 at 11 (quoting *First Union*, 154 Md. App. at 147, 838 A.2d at 433). Rather, plaintiff's evidence demands an inference from silence.

The district court's "function" is not "to weigh the evidence and determine the truth of the matter[.]" *Anderson*, 477 U.S. at 249. It is not for the Court to make credibility determinations, *Jacobs*, 780 F.3d at 569, nor, when faced with ambiguity and silence, to infer a party's state of mind, let alone decide that defendant acted with "deliberate intent to deceive." *First Union*, 154 Md. App. at 147, 838 A.2d at 433. Accordingly, the finder of fact is better suited to determine Agbodjogbe's scienter and the merits of plaintiff's claim for fraudulent misrepresentation.

## IV. Conclusion

For the forgoing reasons, I shall grant the Motion in part and deny it in part. Specifically, I shall grant the Motion as to Count VII (breach of contract) but deny it as to Count I (fraudulent misrepresentation). An Order follows, consistent with this Memorandum Opinion.

Date: January 14, 2019  /s/
Ellen Lipton Hollander
United States District Judge